1

2

3

4

5

6

7

8                           UNITED STATES DISTRICT COURT

9                           EASTERN DISTRICT OF CALIFORNIA

10

11   RYAN SMITH, individually and on behalf        Case No.  1:21-cv-00376-AWI-EPG
     of other members of the general public
12   similarly situated,                           FINDINGS AND RECOMMENDATIONS
                                                    RECOMMENDING THAT PLAINTIFF'S
13                Plaintiff,                        MOTION FOR PRELIMINARY APPROVAL
                                                    OF CLASS ACTION SETTLEMENT BE
14         v.                                       DENIED

15   GRUNDFOS PUMPS                                 (ECF No. 5)
     MANUFACTURING CORPORATION, et
16   al.,                                           OBJECTIONS, IF ANY, DUE WITHIN
                                                    FOURTEEN (14) DAYS
17                Defendants.

18

19         Before the Court is Plaintiff Ryan Smith's ("Plaintiff") motion for preliminary approval of

20   a class action and Private Attorneys General Act ("PAGA") settlement. (ECF No. 5.) For the

21   following reasons, the Court recommends that the motion be denied.

22         **I.        BACKGROUND**

23         **A.        Procedural History**

24         Defendants Grundfos Americas Corporation, Grundfos CBS Inc., Grundfos Pumps

25   Corporation, Grundfos Pumps Manufacturing Corporation, Grundfos U.S. Holding Corporation,

26   and SFS Holding, Inc. (collectively, "Defendants") are Danish pump manufacturers. (*See* ECF

27   No. 5 at 13.) The proposed settlement class consists of non-exempt, hourly paid employees who

28   worked for any of the Defendants in California from February 24, 2016 through August 5, 2021.

1    (ECF No. 5-1 at 8.)

2           Plaintiff originally filed this putative class action in the Superior Court of California for

3    the County of Fresno on February 24, 2020. (ECF No. 5 at 13.) Plaintiff subsequently amended

4    his complaint to include representative claims under PAGA. (*Id.*) On March 10, 2021, Defendants

5    removed this action to federal court. (*See* ECF No. 1.) The operative Second Amended Complaint

6    alleges claims for: (1) violation of the Fair Labor Standards Act; (2) failure to pay overtime

7    wages; (3) failure to pay minimum wages; (4) meal period violations; (5) rest period violations;

8    (6) non-compliant wage statements and failure to maintain accurate payroll records; (7) failure to

9    timely pay wages upon termination; (8) failure to timely pay wages during employment; (9)

10   failure to pay business-related expenses; (10) violation of PAGA pursuant to California Labor

11   Code §§ 2698, *et seq.*; (11) unlawful business practices in violation of California Business and

12   Professions §§ 17200, *et seq.*; and (12) unfair business practices in violation of California

     Business and Professions §§ 17200, *et seq.* (ECF No. 1-5.)

13          On April 27, 2021, Plaintiff filed a motion for preliminary approval of the class action and

14   PAGA settlement. (ECF No. 5.) By way of the motion, Plaintiff seeks preliminary approval of the

15   parties' settlement agreement; conditional certification of the proposed settlement class;

16   appointment of Plaintiff as class representative; appointment of Capstone Law APC as class

17   counsel; approval of the proposed notice of proposed class action settlement to the settlement

18   class; appointment of CPT Group, Inc. as the settlement administrator; and a hearing for final

19   approval of the settlement. (*Id.* a 2.) On May 28, 2021, Defendants filed a statement of non-

20   opposition to the motion. (ECF No. 7.)

21          On June 11, 2021, the Court held a hearing on the motion. (ECF No. 9.) Counsel Raul

22   Perez appeared telephonically on behalf of Plaintiff and counsel Michael Nader appeared

23   telephonically on behalf of Defendants. (*Id.*) At the hearing, the Court expressed concerns that it

24   did not have sufficient information to determine that the settlement was fair and reasonable. (*See*

25   ECF No. 15.) The Court also expressed concerns about the scope of investigation into the class

26   claims, as well as the amount of attorneys' fees requested. (*See id*.) The Court granted the parties

27   leave to file supplemental evidence in support of the motion. (ECF No. 9)

     ///

28

On September 10, 2021, Plaintiff and Defendants each filed supplemental briefing in support of the motion.  (ECF Nos. 17, 18.)

### B.    Proposed Settlement Agreement

On December 1, 2020, the parties participated in a full-day mediation with Louis Marlin, Esq. (ECF No. 5 at 15.) The parties entered into a written memorandum of agreement, and subsequently negotiated a complete settlement of Plaintiff's claims. (*Id.*; ECF No. 5-1 at 11-12.)

The settlement agreement defines the class as "all current and former non-exempt, hourly paid employees who worked for any of the Defendants at any time in the State of California from February 24, 2016 through the earlier of the following dates: (a) August 5, 2021, or (b) the date of the Court's order granting preliminary approval of this Agreement . . .."[1] (ECF No. 5-1 at 8.) Putative class members are members of the settlement class unless they submit a timely request for exclusion no later than 45 days after the notice is mailed. (*Id.* at 11, 15-16.) According to the motion, there are an estimated 500 class members. (ECF No. 5 at 16.)

The maximum sum to be paid by Defendants pursuant to the settlement is $1,200,000.00,[2] to be allocated as follows: attorneys' fees in the amount of $400,000.00; litigation costs and expenses not to exceed $20,000.00; settlement administration costs, estimated to be $15,000.00; $80,000.00 in PAGA payments, with $60,000.00 paid to the California Labor and Workforce Development Agency (the "LWDA") and $20,000.00 to aggrieved employees; a $10,000.00 service award to Plaintiff; and a $695,000.00 net settlement fund to be distributed to settlement class members on a pro rata basis. (ECF No. 5 at 11-12; ECF No. 5-1 at 9.)

Individual settlement payments are calculated using the following formula:

Using the Class Data, the Settlement Administrator will calculate the total Workweeks for all SCMs. The respective Workweeks for each SCM will be

---

[1] The "Class Period" or "Covered Period" is defined as "the time period from February 24, 2016 through the earlier of the following dates: (a) August 5, 2021, or (b) the date of the Court's order granting preliminary approval of this Agreement . . .." (ECF No. 5-1 at 8.)

[2] The settlement agreement contains an "Escalator Clause," which states: "[a]t the mediation, Defendants reported that there are approximately 450 putative class members. If, as of the date the Court grants preliminary approval of this Agreement, the total number of Settlement Class Members is greater than 495, then Defendants will proportionally increase the MSA according to the following formula: total number of class members (divided by) 495 (multiplied by) $1,200,000 then subtract $1,200,000. For example, if there are 500 class members on the date that the Court grants preliminary approval, then the calculation would be as follows: 500/495 = 1.01 (x) $1.2M = $1,212,121.21 (minus) $1.2M = $12,121 added to the MSA." (ECF No. 5-1 at 12.)

divided by the aggregate total Workweeks for all SCMs, resulting in the Payment Ratio for each individual SCM. Each SCM's Payment Ratio will then be multiplied by the NSA to calculate each SCM's estimated ISP. The ISP will be provided only to the individual SCM. Each ISP will be reduced by any legally mandated employee tax withholdings (e.g., employee payroll taxes, etc.). The ISP checks will include an endorsement confirming that by cashing the check, each SCM is releasing the Released Claims.

(ECF No. 5-1 at 16-17.)[3] The motion estimates an average payout of $1,390.00 per settlement class member. (ECF No. 5 at 12.) Any individual settlement payments that remain uncashed after 180 days will be tendered to the Controller of the State of California to be held pursuant to the Unclaimed Property law, California Civil Code §§ 1500 *et seq.* (*Id.* at 17.)

The settlement agreement provides for the following release of claims by settlement class members:

all Claims, causes of action, as well as factual or legal theories alleged in the Action, or reasonably could have been alleged based on the alleged facts and legal theories in the Action, including all of the following legal claims: all claims alleged in the Action, including any and all claims for unpaid wages, all claims in the SAC alleging that Defendants violated the Fair Labor Standards Act (FLSA), claims for minimum, overtime, and double-time wages, the alleged failure to pay for all time worked, the alleged failure to pay for all hours worked at correct rates, including overtime at the correct rates; any and all claims for meal period violations, including claims for late, short, interrupted and/or missed meal periods and/or the failure to pay premiums, and the alleged failure to properly record meal breaks; any and all claims for rest break violations, including claims for late, short, interrupted and/or missed rest breaks and/or the failure to pay premiums; any and all claims for unreimbursed expenses, including, but not limited to, expenses incurred for personal cell phone usage and mileage; any and all claims for improper or inaccurate itemized wage statements, including any alleged violations of Labor Code Section 226(a)(1)-(9), and including claims for injuries suffered therefrom; any and all claims for waiting time penalties under Labor Code Section 203 based on the facts, claims, causes of action, or legal theories alleged in the Action; any and all claims regarding the alleged failure to maintain required records in violation of Labor Code §§ 226, 1174, 1198, 2810.5, and IWC Wage Order No. 1-2001, § 7; any and all claims for civil penalties under the Labor Code Private Attorneys General Act of 2004, Labor Code Section 2699 et seq. ("PAGA") premised on the facts, claims, causes of action, or legal theories described in the PAGA Letter; any and all claims under the Business & Professions Code (including Section 17200 et seq.) premised on the facts, claims, or legal theories described in the Action; any other claims or penalties under the wage and hour laws pleaded in the Action; and all damages, penalties, interest and other amounts recoverable under all Claims under California and federal law, to the extent permissible, including but not limited to the FLSA and the California Labor Code as to the facts and theories alleged in the Action, and the applicable

---

[3] Each individual settlement payment is allocated as 25% wages subject to IRS Form W-2 reporting and applicable taxes/withholdings, and 75% as non-wage income, penalties, and interest for which an IRS Form 1099 will be issued. (ECF No. 5-1 at 17.)

Wage Orders as to the facts and theories alleged in the Action (collectively, the "Released Claims."). Released Claims also means that all Settlement Class Members will be bound by a limited Civil Code Section 1542 waiver that releases all Claims against Defendants, whether known or unknown, within the definition of the defined Released Claims, irrespective of the factual or legal basis for such claims. The scope of the Section 1542 waiver is limited to the Released Claims. The Parties understand and specifically agree that this limited Section 1542 waiver (i) is a material part of the consideration for this Agreement; (ii) was critical in justifying the agreed upon economic value of this settlement; (iii) without it, Defendants would not have agreed to the consideration provided; and (iv) is narrowly drafted and necessary to ensure that Defendants are obtaining peace of mind regarding the resolution of all Claims that were or could have been alleged based on the facts and legal theories contained in the Action. The period of the Release shall extend to the limits of the Covered Period. The res judicata effect of the Judgment will be the same as that of the Release.

(ECF No. 5-1 at 10-11.) The settlement agreement also contains a broader general release by

Plaintiff:

As of the Effective Date, in exchange for the consideration in this Settlement Agreement, Plaintiff, for himself and his heirs, successors and assigns, hereby waives, releases, acquits and forever discharges the Released Parties from any and all Released Claims as well as any and all claims, actions, charges, complaints, grievances and causes of action, of whatever nature, whether known or unknown, which exist or may exist on Plaintiff's behalf as of the date his signs this Settlement Agreement, including, but not limited to, any and all tort claims, contract claims, claims for unpaid wages, wrongful termination claims, disability claims, benefit claims, public policy claims, retaliation claims, statutory claims, personal injury claims, emotional distress claims, invasion of privacy claims, defamation claims, fraud claims, quantum meruit claims, and any and all claims arising under any federal, state or other governmental statute, law, regulation or ordinance, including, but not limited to, claims for violation of the Fair Labor Standards Act, the California Labor Code, the Wage Orders of California's Industrial Welfare Commission, other state wage and hour laws, the Americans with Disabilities Act, the Employee Retirement Income Security Act, Title VII of the Civil Rights Act of 1964, the California Fair Employment and Housing Act, the California Family Rights Act, the Family Medical Leave Act, California's Whistleblower Protection Act, California Business & Professions Code Section 17200 et seq.. Plaintiff expressly waives any and all claims, rights or benefits he may have under California Civil Code § 1542, which provides as follows: "A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party." Plaintiff may later discover claims or facts in addition to, or different from, those which he knows or believes to exist, but he expressly agrees to fully, finally and forever settle and release any and all claims against the Released Parties, known or unknown, suspected or unsuspected, which exist or may exist at the time he signs this Settlement Agreement, including, but not limited to, any and all claims relating to or arising from Plaintiff's employment with Defendants. The Parties further acknowledge, understand and agree that this Settlement Agreement would not have been finalized without this representation and commitment from the Plaintiff.

(ECF No. 5-1 at 12-13.)

5

Class members who wish to object to the settlement must object in writing no later than 45 days after notice is mailed. (ECF No. 5-1 at 16.) Class members who timely object in writing may appear at the final fairness hearing to have their objection heard by the Court. (*Id.*) Plaintiff also provides a proposed notice outlining the written objection process and providing information regarding the final fairness hearing. (*Id.* at 28-29.)

## II.     LEGAL STANDARDS

Federal Rule of Civil Procedure 23(e) requires judicial review and approval of any proposed class action settlement agreement.  This requirement is in place because "the parties that are present and settling the case — class counsel, the class representatives, and the defendants — are proposing to compromise the rights of absent class members," and judicial review "aims to ensure that the interests of these absent class members are safeguarded." *Lusk v. Five Guys Enterprises LLC*, 2019 WL 7048791, at *1 (E.D. Cal. Dec. 23, 2019) (quoting *Newberg on Class Actions* § 13:40 (5th ed.)).

"Courts have long recognized that settlement class actions present unique due process concerns for absent class members." *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011) (citation and quotation marks omitted). When parties seek approval of a settlement agreement negotiated prior to formal class certification, "there is an even greater potential for a breach of fiduciary duty owed the class during settlement." *Id.* Thus, a court must review such agreements with "a more probing inquiry" for evidence of collusion or other conflicts of interest than what is normally required under the Federal Rules. *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998); *see also Bluetooth*, 654 F.3d at 946.

Rule 23(e)(1), as amended in 2018, requires the movant to "provide the court with information" that shows that "the court will likely be able to" make two separate determinations. Fed. R. Civ. P. 23(e)(1).  First, approval of the settlement agreement is warranted under Rule 23(e)(2).  Second, class certification is warranted under Rule 23(a)-(b) "for purposes of judgment on the proposal."  Fed. R. Civ. P. 23(e)(1)(B)(ii).

As for the first determination, Rule 23(e)(2) authorizes final approval of class action settlement agreement only if the movant shows that the settlement agreement is "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2).  To determine whether the settlement agreement is fair,

reasonable, and adequate, the Court must consider four factors.  First, whether "the class representatives and class counsel have adequately represented the class."  Fed. R. Civ. P. 23(e)(2)(A).  Second, whether "the proposal was negotiated at arm's length."  Fed. R. Civ. P. 23(e)(2)(B).  Third, whether "the relief provided for the class is adequate," considering "(i) the costs, risks and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment;" and (i) any agreement made in connection with the proposal. Fed. R. Civ. P. 23(e)(2)(C).  Fourth, whether "the proposal treats class members equitably relative to each other."  Fed. R. Civ. P. 23(e)(2)(D). The first and second factors are viewed as "procedural" in nature, and the third and fourth factors are viewed as "substantive" in nature.  Fed. R. Civ. P. 23(e)(2) Advisory Committee's note to 2018 amendment.

As for the second determination as to whether class certification is warranted under Rule 23(a)-(b), the court must determine whether it is "likely" that it will be able to "certify the class for purposes of judgment on the proposal."  Fed. R. Civ. P. 23(e)(1).  Accordingly, the court must review the class certification standards under Rule 23(a)-(b), and based on those standards the court must "reach a tentative conclusion that it will be able to certify the class in conjunction with final approval of the settlement."  *Lusk,* 2019 WL *Newberg on Class Actions* § 13:18 (5th ed.).

### III.   DISCUSSION

The Court finds that Plaintiff has not established that the settlement is fair, reasonable, and adequate pursuant to Rule 23(e) and recommends denial of the motion on that basis.[4] Although the Court appreciates the additional information supplied in Plaintiff's supplemental briefing, it has identified the following issues that prevent the Court from recommending approval at this time.

///

///

///

---

[4] Because the Court finds preliminary approval of the proposed settlement is not appropriate, it has not addressed whether Plaintiff has provided sufficient information to certify the class for settlement purposes under Rules 23(a)-(b).

**A.**   **Summary of Plaintiff's Arguments and Evidence Regarding Whether the Settlement is Fair, Reasonable, and Adequate**

1.   <u>Plaintiff's Motion</u>

In the motion, Plaintiff argues that the settlement is fair, reasonable, and adequate because it was negotiated at arm's length with the assistance of a mediator and "confers substantial benefits" to settlement class members. (ECF No. 5 at 27.) These benefits are "particularly impressive when viewed against the difficulties encountered by plaintiffs pursuing wage and hour cases." (*Id.*)

Plaintiff argues that his counsel "conducted a thorough investigation into the factual and legal issues implicated by Plaintiff's claims[.]" (ECF No. 5 at 14.) Plaintiff submits a declaration from his counsel, Mr. Perez, stating that the investigation consisted of Plaintiff contacting his counsel before filing the action to discuss the factual bases for the case, Plaintiff summarizing policies and practices to his counsel over the course of multiple interviews, Plaintiff's counsel conducting a "preliminary investigation" in preparation for filing the complaint which entailed a "careful examination of Plaintiff's personnel file and associated records," and Plaintiff's counsel researching and preparing a letter to the LWDA. (*Id.*; ECF No. 5-1 at 3.) Plaintiff's counsel, through informal and formal discovery requests, received "a considerable amount of documents and data, including employee demographic data, a sample of time and pay records, and Defendants' policies and procedures manuals[.]"  (ECF No. 5 at 14-15; ECF No. 5-1 at 4.) Plaintiff's counsel's investigation of the claims included:

> (1) determining Plaintiff's suitability as a private attorney general and class representative through interviews, background investigations, and analyses of his employment files and related records; (2) evaluating all of Plaintiff's potential representative claims; (3) researching similar wage and hour class actions as to the claims brought, the nature of the positions, and the type of employer; (4) analyzing a sample of Class Members' time and pay records; (5) reviewing Defendants' labor policies and practices; (6) researching settlements in similar cases; (7) evaluating Plaintiff's claims and estimating Defendants' liability for purposes of settlement; (8) drafting the mediation brief; and (9) participating in the mediation.

(ECF No. 5 at 15; ECF No. 5-1 at 4.)

The motion provides a chart of the following value estimates for each claim: (1) $2,060,000.00 for the meal period claim; (2) $1,260,000.00 for the rest period claim; (3) $1,775,510.00 for the minimum wage claim; (4) $458,080.00 for the business expense claim; (5)

$1,800,000.00 for the wage statement claim; (5) $771,950.00 for the final pay claim. (ECF No. 5 at 28.) The total estimated value for these claims is $8,125,540.00. (*Id.*) Thus, the proposed settlement, including all fees and costs, is about 15% of Plaintiff's estimated value of the claims. The proposed payout to class members after the proposed fees and costs is approximately 8.5% of Plaintiff's estimate of the value of the claims.

Plaintiff's counsel discounted the estimated amounts in light of several factors, including the strength of Defendants' defenses to the merits, the risk of class certification being denied, the risk of losing on any of a number of dispositive motions, the risk of losing at trial, the chances of a favorable verdict being reversed on appeal, and the difficulty of collecting on a judgment. (*Id.* at 29.) In light of these factors,

> Plaintiff's Counsel determined that it would be reasonable to settle for a fraction of Defendants' maximum potential exposure for the class claims . . or approximately 15%, which is essentially the product of the probability of: (i) certification being granted on **all claims** (≈ 55%); (ii) prevailing on summary judgment/motions in limine/renewed motions to deny certification on **all claims** (≈ 55%); (iii) prevailing at trial on **all of Plaintiff's claims** (≈ 50%); i.e., 55% × 55% × 50%.

(*Id.*) (Emphasis in original.) Plaintiff argues that this discount "is inherently reasonable" because he would have had to overcome multiple, dependent contingencies to prevail, and "[i]f anything, the projected odds for each of the above contingencies is generous to the class' position[.]" (*Id.*)

As to the PAGA claims, Plaintiff's counsel determined that aggrieved employees worked a combined total of approximately 19,600 pay periods during the PAGA period. (ECF No. 5 at 35.) This determination was "[b]ased on information and evidence produced by Defendants during discovery[.]" (*Id.*) Plaintiff's counsel calculated Defendants' maximum exposure as $1,960,000.00, calculated by multiplying 19,600 pay periods by $100, representing the statutory penalty for an initial violation. (*Id.* at 36.) Plaintiff's counsel further discounted the valuation to $80,000.00 because courts have wide latitude to reduce the amount of civil penalties. (*Id.* at 35-37.) According to Plaintiff, this is "consistent with other hybrid/PAGA settlements approved by California courts." (*Id.* at 38.)

### 2. Plaintiff's Supplemental Brief

After the hearing on the motion, Plaintiff submitted supplemental briefing as well as declarations from Mr. Perez, Plaintiff, and 13 settlement class members. (ECF Nos. 18, 18-1, 18-

1   2, 18-3.)[5]

2        *Meal Period Claim*

3        Plaintiff explains that his meal period claim is based on the allegation that class members

4   regularly had their meal periods delayed and/or interrupted because of periods of heavy workload

5   that required employees to postpone their meal periods until after the fifth hour of work, and

6   occasionally return to work during meal periods while off-the-clock. (ECF No. 18 at 10.) Plaintiff

7   alleges that this was due to understaffing, which did not allow for proper break coverage. (*Id.*)

8   Based on a review of a sample of class members' time and pay records, Plaintiff's counsel

9   determined that there were approximately 107,965 meal period violations during the class period

10  reflected in the time records, or approximately 50% of all meal-period eligible shifts, each

11  earning one hour of premium pay at the average hourly rate of $19.38, less the estimated

12  $32,350.00 in meal period premiums that Defendants paid during the class period. (*Id.*) Plaintiff's

13  counsel arrived at a valuation of $2,060,000.00 for the meal period claims by multiplying 107,965

    by $19.38 then subtracting $32,250.00. (*Id.*)

14        According to Plaintiff, Defendants would have argued that they were not required to

15  guarantee employees actually took a meal break. (ECF No. 18 a 10-11.) Additionally, some

16  courts have declined to certify meal break claims where there is no common policy denying

17  breaks on a class-wide basis. (*Id.* at 11.)

18        *Rest Period Claim*

19        Plaintiff's counsel estimates that 30% of all rest period eligible shifts had violations,

20  which corresponds to slightly more than one violation per week. (ECF No. 18 at 12.) According

21  to Plaintiff's counsel, this estimate is "[b]ased on Plaintiff's experiences and interviews with

22  Class Members[.]" (*Id.*; ECF No. 18-1 at 5.) Defendants' exposure was therefore calculated by

23  multiplying 216,700 rest period-eligible shifts as of the date of the settlement by $19.38 average

24  hourly wage, and then this figure was multiplied by 30%, resulting in a value of $1,260,000.00.

25  (ECF No. 18 at 12.) Defendants would have argued that California law does not require

26  employees to record rest periods, resulting in individualized inquiries. (*Id.* at 12-13.)

27  _____
    [5] Defendants also submitted supplemental briefing in support of the motion. (ECF No. 17.) Defendants' supplemental
28  briefing solely discusses the scope of the release in the settlement agreement and does not address whether the
    settlement is fair, reasonable, or adequate.

*Minimum Wage/Overtime Claim*

Plaintiff alleges that class members were required to communicate with their supervisors over their personal cellular devices throughout each week. (ECF No. 18 at 13.) These communications occurred outside scheduled shifts while employees were off-the-clock. (*Id.* at 14.) "Assuming one hour of off-the-clock work per work week, at an overtime rate of $29.07 as the average shift length in the sample was over 8 hours (8.21 hours)," the value of the minimum wage/overtime claim was calculated by multiplying 61,077 total weeks by $29.07, resulting in an estimated value of $1,775,510.00. (*Id.*) Defendants would have argued that their policies prohibit off-the-clock work and determining whether employees worked off-the-clock would result in individualized inquiries. (*Id.*)

*Wage Statement Claim*

Based on the preceding claims, Plaintiff alleges that Defendants issued non-compliant wage statements that failed to accurately report the total number of hours worked during each pay period. (ECF No. 18 at 16-17.) Under Labor Code § 226, employees injured by a knowing intentional wage statement violation are entitled to recover the greater of all actual damages, or fifty dollars for the initial violation and one hundred dollars for each subsequent violation, not to exceed an aggregate penalty of $4,000.00.  (*Id.* at 17.) Using the statutory formula, Plaintiff's counsel calculated Defendants' maximum exposure by multiplying an estimated 450 class members during the one-year statute of limitations by $4,000.00, resulting in a value of $1,800,000.00. (*Id.*) Defendants would have argued that the statute requires a knowing and intentional violation, their policies were facially compliant with the Labor Code, and they should not be penalized for technical violations that do not result in injury. (*Id.*)

*Final Pay Claim*

According to Plaintiff, because Defendants failed to pay class members all minimum and overtime wages within 72-hours of their termination, class members are entitled to waiting-time penalties. (ECF No. 18 at 18.) Pursuant to Labor Code § 203, if an employer willfully fails to pay all wages at separation of employment, the wages continue for up to 30 days. (*Id.*) Plaintiffs' counsel used the statutory formula to calculate the value of this claim by multiplying 166 former employees by $19.38 per hour, then multiplying that amount by 8 hours per day and 30 days,

resulting in a value of $772,000.00. (*Id.*) Defendants would have argued that waiting time penalties require a willful violation, which would have been difficult to prove. (*Id.*)

### Investigation of Claims

According to Plaintiff's supplemental briefing, the parties exchanged both formal and informal discovery. (ECF No. 18 at 20.) Plaintiff requested a copy of his personnel file, which included his wage statements, offer letter, and form documentation such as new hire documents, meal period waiver forms, and policy acknowledgement forms. (*Id.* at 21.) Plaintiff propounded two sets of interrogatories, consisting of a total of twelve separate interrogatories, and one set of requests for production of documents, consisting of forty document requests. (*Id.*)

After Plaintiff's written discovery was served, the parties agreed to conduct informal discovery "which produced the majority of the information requested via formal discovery." (ECF No. 18 at 21.) This informal discovery included production of employee handbooks from 2016 through 2020. (*Id.*) Defendants also produced training modules used in new hire training for 2017, 2018, and 2020 related to timekeeping, payroll, overtime, meal breaks, and rest breaks. (*Id.*) Defendants also produced separate policies and instructions related to meal and rest periods and timekeeping. (*Id.*)

Plaintiff's consultant analyzed over 110,000 lines of data of time and pay records for nearly 20% of the putative class. (ECF No. 18 at 21.)  Additionally, Plaintiff's counsel interviewed putative class members regarding their work experiences with Defendant. (*Id.* at 22.) Plaintiff submits declarations from 13 class members in support of his supplemental briefing. (*Id.*)

### Class Member Declarations

According to Defendants' supplemental briefing, the parties met and conferred after the hearing on the motion and Defendants agreed to provide contact information for 116 former employees out of a total of approximately 237 former employees in the alleged class, subject to a stipulated protective order. (ECF No. 17 at 2.) Plaintiff submits declarations from 13 putative class members: Erik Avila, Jerome Blanco, Julian Chavez, Petra Chavez, Angelina Cortez, Linda Luallen, John McGuire, John Nunez, Ricardo Palomino, Jesus Rodriguez, Daniel Soto, Jeffrey Staab, and Alan Vargas Marquez. (ECF No. 18-3.) All declarants were non-exempt, paid hourly, and worked for Defendants at least 40 hours per week, five days a week. (*See id.*)

Erik Avila, Jerome Blanco, Julian Chavez, Linda Luallen, Ricardo Palomino, Jesus Rodriguez, and Jeffrey Staab declare that they regularly worked more than five hours before taking their first meal breaks. (ECF No. 18-3 at 6, 9, 12, 21, 31, 35, 41.) Erik Avila, Jerome Blanco, Petra Chavez, Ricardo Palomino, Jesus Rodriguez, and Jeffrey Staab also declare that their meal periods were often cut short and they often did not receive meal breaks of at least 30 minutes. (*Id.* at 6, 9, 15, 31, 35, 41.)

Erik Avila estimates that he did not receive a compliant meal break approximately four times per week. (ECF No. 18-3 at 6.) Jerome Blanco estimates that he did not receive a compliant meal break approximately three times per week. (*Id.* at 9) Julian Chavez and Jeffrey Staab estimate that they did not receive a compliant meal break on a daily or almost daily basis. (*Id.* at 12, 42.) Petra Chavez estimates that she did not receive a compliant meal break approximately three times per month. (*Id.* at 15.) Linda Luallen estimates that she did not receive a compliant meal break once per year. (*Id.* at 21.) Ricardo Palomino estimates that he did not receive a compliant meal break approximately twice per week. (*Id.* at 31.)  Jesus Rodriguez estimates that he did not receive a compliant meal break three-to-five times per month. (*Id.* at 35.) All of these declarants except Erik Avila state that they were never paid an extra hour of pay for missed, late, or interrupted meal breaks. (*Id.* at 6, 9, 12, 16, 21, 32, 36, 42.)

Erik Avila, Jerome Blanco, Julian Chavez, Angelina Cortez, Linda Luallen, John McGuire, Ricardo Palomino, Jesus Rodriguez, Daniel Soto, Jeffrey Staab, and Alan Vargas Marquez also declare that they were denied timely, uninterrupted, full ten-minute rest breaks. (ECF No. 18-3 at 7, 10, 13, 18, 22, 25, 36, 42, 44.) Erik Avila, Jerome Blanco, and Jeffrey Staab estimate that they were unable to take a compliant rest break at least five times per week. (*Id.* at 7, 10, 42.) Julian Chavez and Linda Luallen estimate that they were unable to take a compliant rest break once every two weeks. (*Id.* at 13, 22.) Angelina Cortez estimates that she was unable to take a compliant rest break once per month. (*Id.* at 18.) John McGuire and Jesus Rodriguez estimate that they were unable to take a compliant rest break one-to-two times per week. (*Id.* at 25, 36.) Ricardo Palomino and Daniel Soto estimate that they were unable to take a compliant ten-minute rest break once per week. (*Id.* at 32, 38.) Alan Vargas Marquez estimates that he was unable to take a compliant rest break twice per week during busy seasons. (*Id.* at 45.) None of the

13

declarants were paid an extra hour for missed, late, or interrupted rest breaks. (*Id.* at 7, 10, 13, 18-19, 22, 25, 32, 36, 38-39, 42, 45.)

Linda Luallen, John Nunez, and Ricardo Palomino declare that they were required to communicate with supervisors when they were not clocked in for work. (ECF No. 18-3 at 22, 28, 32.) They were not paid for this time and were not reimbursed for their cellular phone expenses. (*Id.* at 22, 28-29, 32.) Linda Luallen estimates that she spent at least a few minutes on two-to-three occasions corresponding with supervisors while off the clock. (*Id.* at 22.) John Nunez estimates that he spent at least two-to-three minutes each week corresponding with supervisors while off the clock. (*Id.* at 28.) Ricardo Palomino estimates that he spent at least ten-to-fifteen minutes each week speaking with supervisors while off the clock. (*Id.* at 32.)

**2.     Scope of Investigation**

The Court's recommendation against approval of the settlement is based on (1) the small amount of investigation into the actual value of the class claims before mediation, resulting in a very high amount of estimates and guesswork that may or may not reflect a true value of claims and (2) the very significant discount this settlement gives to the claims based on even Plaintiff's estimate of value. As discussed more below, Plaintiff's counsel is also seeking an above-benchmark amount of fees. While the Court appreciates that the total proposed settlement is a substantial amount of money, and the mediation was conducted at arms-length, these factors together create a concern that counsel has chosen to settle early in this case rather than further investigate and litigate the claims at significant detriment to absent class members.

According to Mr. Perez's declarations, Plaintiff's counsel's investigation of the case prior to mediation consisted primarily of interviews with Plaintiff and review of Plaintiff's personnel file, samples of time and pay records employee demographic data, and Defendants' policies and procedures. (*See* ECF No. 5-1 at 3-4.) In terms of discovery, Plaintiff propounded two sets of interrogatories and one set of requests for production after the lawsuit was filed. (ECF No. 18-1 at 13.) However, the parties agreed to informal discovery after these requests were propounded, and Defendants produced their policies and procedures as well as a 20% sample of time and pay records. (*Id.* at 13-14.)

///

14

Thus, before agreeing to the proposed amount, no formal discovery was completed. No depositions were taken. And no interviews with class members other than Plaintiff were conducted. While Plaintiff is not required to conclusively prove his claims at this stage, "[c]lass action settlements are favored more when a considerable amount of discovery has been conducted, and this is because the considerable discovery 'suggests that the parties arrived at a compromise based on a full understanding of the legal and factual issues surrounding the case.'" *Lusk v. Five Guys Enterprises LLC,* 2019 WL 7048792, at *7 (E.D. Cal. Dec. 23, 2019) (quoting *Adoma v. Univ. of Phoenix, Inc.*, 913 F. Supp. 2d 964, 977 (E.D. Cal. 2012)); *see also Millan v. Cascade Water Serv*s., Inc., 310 F.R.D. 593, 610-11 (E.D. Cal. 2015) (denying preliminary approval of a class settlement where class counsel relied heavily on information provided by the named plaintiff and defendant, assumed the number of violations, and did not present documentation regarding the extent of discovery); *cf. In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000), *as amended* (June 19, 2000) (finding that preliminary approval was appropriate where extensive formal discovery had not been completed but counsel presented the district court with documentation that they had conducted significant informal investigation, discovery, and research). The Court does not believe that such an investigation and discovery was sufficient for counsel to truly understand and value the claims subject to settlement.

Following the hearing on preliminary approval, and in response to the Court's expressed concerns, it appears that Plaintiff's counsel undertook some additional investigation. According to the supplemental briefing, Defendants' counsel provided contact information for 116 former employees. Plaintiff's counsel provided declarations from 13 of these employees. However, again, none of these interviews took place prior to mediation. There is no explanation how the 13 individuals providing declarations were chosen, or how they represent the rest of the 116 former employees or the class. Moreover, there has been no attempt to adjust the proposed settlement amount to account for this information. Plaintiff's counsel does not attempt to explain that their new investigation confirmed all of the assumptions in the first motion, and it would be surprising indeed if they had. While the Court appreciates the work counsel has done to support approval of the proposed settlement, that work does not allay the Court's concern that the proposed amount was reached without an adequate investigation.

### 3.   Valuation of Claims

The Court also cannot conclude that the proposed settlement provides adequate relief to the class in light of the potential recovery, discounted by the risk of adjudication on the merits. *See Lusk v. Five Guys Enterprises LLC,* 2021 WL 2210724, at *3 (E.D. Cal. June 1, 2021) ("The relief obtained by the class is often described as the most important part of a class settlement.") (citing *Carlin v. DairyAmerica, Inc.*, 380 F.Supp.3d 998, 1011 (E.D. Cal. 2019)). The damages analysis submitted in support of Plaintiff's motion and supplemental briefing is unclear and does not explain many of the assumptions underlying counsel's calculations. Additionally, in certain respects, the class member declarations submitted in support of the motion do not substantiate Plaintiff's counsel's estimates.

For example, Mr. Perez's supplemental declaration states that he determined there were approximately 107,965 meal period violations, corresponding to violations during approximately 50% of all meal-period eligible shifts, during the class period. (ECF No. 18-1 at 3.) Plaintiff's counsel explains that the 50% figure reflects the rates of meal break violations reported in the class member declarations submitted in support of the supplemental briefing. (*Id.*) But Mr. Perez does not provide any calculations for this, such as the number of members interviewed, the number of responses given, the average of responses, etc. Instead, 50% appears to be a very high-level approximation only broadly informed, if at all, by counsel's investigation.

Plaintiff's counsel additionally explains that, based on Plaintiff's experiences and class member interviews, he estimated that 30% of all rest period eligible shifts had rest break violations, which corresponds to slightly more than one rest break violation per week. (ECF No. 18-1 at 5.) Again, counsel does not tie this to any calculations. In fact, by the Court's own review, the average estimated rate of rest break violations in the class member declarations, including the two declarants who did not report experiencing rest break violations, is roughly between one-and-a-half and two times per week. (*See* ECF No. 18-3.)

Plaintiff's counsel states that he calculated the meal and rest break and final pay damages using an average wage of $19.38, but does not identify the information he relied on for this figure. (*See* ECF No. 18-1 at 3, 5, 10.) Plaintiff's counsel also does not explain how he obtained the estimate of $32,250.00 in meal period premiums that Defendants paid during the class period.

1   (*See id.* at 3.)

2   As to the minimum wage and overtime claim, Plaintiff's counsel estimates the class's

3   potential recovery by assuming one hour of off-the-clock work per work week at an overtime rate

4   of $29.07. (ECF No. 18-1 at 6-7.) Plaintiff's counsel's calculations regarding the business

5   expense claim also assume $30 in cell phone expenses in ¼ of all workweeks. (*Id.* at 9.)

6   However, Plaintiff's counsel does not explain how he arrived at these numbers, and the class

7   member declarations do not support these estimates. The three relevant class member declarations

8   submitted in support of Plaintiff's supplemental briefing estimated that the declarants spent

9   anywhere from a few minutes to 10 or 15 minutes per week speaking with supervisors while off

10   the clock. (*See* ECF No. 18-3.) None of the declarants provided an estimate of the amount of their

    cell phone expenses. (*See* ECF No. 18-3.)

11   Plaintiff's counsel further calculates penalties for the wage statement derivative claims

12   suing an estimate of 450 class members, while the motion originally estimated that there were

13   500 class members. (*See* ECF Nos. 5 at 11, 18-1 at 10.) Similarly, the final pay claim calculation

14   is premised on an estimate of 166 former employees, while Defendants' supplemental briefing

15   indicates that there are 237 former employees in the class. (*See* ECF Nos. 17 at 2, 18-1 at 11.)

16   Plaintiff's counsel does not explain the basis for his assumptions and Plaintiff's briefing does not

17   address these discrepancies.

18   Additionally, Plaintiff's risk assessment for each of the California Labor Code claims is

19   problematic because it "merely identifies generalized risks that are inherent and ubiquitous in

20   virtually all wage-and-hour putative class action lawsuits." *Lusk,* 2019 WL 7048791, at *6. While

21   it is appropriate to determine a settlement's value by roughly estimating what the class would

22   have received if it prevailed, then discounting that value by the risks the class would face in

23   securing that outcome, *Lusk,* 2019 WL 7048791, at *7, Plaintiff provided very little analysis of

24   how the facts and evidence in this case give rise to any particular risk. Instead, Plaintiff generally

25   identified legal arguments commonly made by defendants in similar cases then applied significant

26   discounts in light of those arguments. (*See* ECF Nos. 5, 18.) . "[I]t is insufficient for purposes of

27   demonstrating the adequacy of the settlement's relief to baldly assert . . . that the Class's relief

28   should be severely reduced from the maximum exposure, all because proving liability and

establishing class certification on California wage-and-hour claims has historically been

'difficult' and 'challenging' in other lawsuits." *Lusk,* 2019 WL 7048791, at *7. Here, Plaintiff has

not provided factual and evidentiary foundation for how the proposed risk factor discounts were

conceived of and formulated. As a result, the Court cannot determine whether those discounts are

appropriate and the settlement provides adequate value to the class.

The Court has similar concerns regarding the valuation of the PAGA claim.[6] The

settlement agreement allocates $80,000.00 from the maximum settlement amount to the PAGA

claim, of which $60,000.00 is paid to the LWDA and $20,000.00 is paid to aggrieved employees.

(ECF No. 5 at 35.) According to the motion, where an employer has one or more employees,

PAGA civil penalties are imposed at a rate of $100.00 for each aggrieved employee per pay

period for the initial violation and $200.00 per employee for subsequent violations. (*Id.* at 36.)

Plaintiff states that there were a total of approximately 19,600 pay periods during the

PAGA period, but again does not explain how this number was calculated or identify what

information Plaintiff's counsel relied on in making this calculation. (*See id.* at 35.) Plaintiff also

contends that Defendants would have argued PAGA penalties cannot be "stacked" on top of one

another, but does not cite any authority for this theory. (*Id.* at 36.) Plaintiff further indicates that

he disputes this argument, but nonetheless calculates the maximum exposure according to

Defendants' preferred approach by multiplying 19,600 pay periods by $100.00 for a total of

$1,960,000.00. (*Id.*) Plaintiff otherwise does not address why the estimate does not include a

multiplier for the number of aggrieved employees or why there is no calculation of the $200.00

fee for subsequent violations. Additionally, according to the complaint, the PAGA claim

encompasses violations of California Labor Code §§ 201, 202, 203, 204, 222.5, 226(a), 226.7,

510, 512(a), 516, 1174(d), 1182.12, 1194, 1197, 1197.1, 1198, 2802, and 2810.5. (*See* ECF No.

---

[6] Under PAGA, aggrieved employees are able to bring private actions on behalf of themselves and other employees to recover civil penalties for Labor Code violations that were previously recoverable only by the LWDA. *Lusk,* 2021 WL 2210724, at *5 (citations omitted). Civil penalties recovered under PAGA are distinct from statutory penalties under other provisions of the California Labor Code, meaning an employee may recover both PAGA penalties and statutory penalties for Labor Code violations. *Id.* Although PAGA settlements are not evaluated under the exact same Rule 23 standard as class action settlements, courts in this district have applied similar considerations in evaluating class settlements that include PAGA claims. *See, e.g., Hartley v. On My Own, Inc.,* 2020 WL 5017806, at *3 (E.D. Cal. Aug. 25, 2020) (evaluating approval of a PAGA settlement in light of the requirement that it not be "unjust, arbitrary and oppressive, or confiscatory," as well as five relevant factors used for approving class action settlements); *Lusk,* 2021 WL 2210724, at *5-6 (expressing concerns regarding the plaintiff's PAGA analysis when declining to preliminarily approve class settlement).

1-5.) Plaintiff's estimate does not appear to incorporate civil penalties for each of these alleged statutory violations and Plaintiff does not explain why only one violation per pay period is assumed in the damages estimate for this claim.

Plaintiff's counsel also has not sufficiently shown why it is appropriate to reduce the $1,960,000.00 PAGA claim estimate to $80,000.00 for purposes of settlement. Plaintiff contends that other courts routinely reduce PAGA penalties, and therefore Plaintiff's counsel discounted the PAGA claim to approximately four percent of the estimated maximum recovery. (ECF No. 5 at 36-38.) As an example, Plaintiff cites to a reduction to .21 percent of the maximum in *Carrington v. Starbucks Corp.,* 30 Cal.App.5th 504, 528 (2018), where the state court found that imposing the maximum penalty would be unjust, arbitrary, and oppressive based on the defendant's good faith attempts to comply with its obligations and because the violations were minimal. (ECF No. 5 at 37.)  However, Plaintiff does not cite to any facts or evidence showing that the same or similar circumstances exist here. Thus, Plaintiff has not made a preliminary showing that such a drastic reduction would be warranted in light of the facts, evidence, and circumstances of this case.

In light of the foregoing, the Court cannot conclude that Plaintiff has sufficiently shown that the proposed settlement is likely to be approved as fair, reasonable, and adequate. The lack of evidentiary support and explanation for Plaintiff's counsel's calculations in this case raises significant concerns about whether the interests of the absent putative class members were adequately represented in settlement negotiations and the extent to which the settlement is the product of a well-informed negotiation.

Instead, it appears that counsel used very broad estimates, untied to the realities of class experiences, and then very heavily discounted those estimates to an amount Defendants would agree to pay without engaging in litigation. While this amount may represent the amount Defendants will voluntarily pay at this stage, the Court cannot conclude that it provides fair and reasonable compensation for the absent members' claims subject to settlement. Again, the net settlement amount represents less than nine percent of Plaintiff's counsel's estimated maximum damages. Although it is true that a settlement agreement amounting to a low percentage of the class's potential recovery does not render the agreement per se inadequate or unfair, *see Officers*

*for Justice v. Civil Serv. Comm'n of City & Cty. of San Francisco*, 688 F.2d 615, 628 (9th Cir. 1982), courts must "consider plaintiffs' expected recovery balanced against the value of the settlement offer" when addressing whether a proposed settlement is substantively fair or adequate. *In re Tableware Antitrust Litig.,* 484 F.Supp.2d 1078, 1080 (N.D. Cal. 2007); *see also Lusk,* 2019 WL 7048791, at *5 ("[T]he court must consider the amount obtained in recovery against the estimated value of the class claims if those claims were successfully adjudicated on the merits."). There does not appear to be such a basis for this extreme discount, short of the desire to avoid litigation. Accordingly, it is questionable that recovery under the settlement agreement is reasonable or "within the range of possible approval." *See Tableware,* 484 F.Supp.2d at 1079.

      **4. Scope of Release**

      The Court's concerns regarding the adequacy of the settlement are heightened where, as here, all class members who do not affirmatively opt out from the litigation release all claims arising out of the facts, theories, and/or claims asserted in the complaint. "Overly-broad releases of liability may indicate that the class's relief is inadequate and the class's treatment is inequitable." *Lusk,* 2019 WL 7048791, at *10 (citing Fed. R. Civ. P. 23(e)(2)(C); *Newberg on Class Actions* § 13:15 (5th ed.)).

      The parties' settlement agreement releases Defendants from liability on all claims based on the factual or legal theories in this case, whether they were actually asserted or reasonably could have been asserted. (*See* ECF No. 5-1.) The release specifically refers to the FLSA claim, and although an FLSA claim is plead in the operative complaint, Plaintiff does not seek certification of an FLSA collective. Plaintiff's counsel also did not separately value the FLSA claim because California's overtime laws are broader. (*See* ECF No. 18 at 14; *see also* ECF No. 5-1.) The complaint further asserts claims regarding business expenses and mileage employees incurred for physical examinations and/or drug testing, and the settlement agreement expressly releases claims for failure to pay any business expenses and mileage. (ECF No. 5-1 at 10.) The complaint also alleges claims under California Labor Code § 204 for failure to timely pay wages during employment and under California Business and Professions Code §§ 17200, *et seq.* (ECF No. 1-5.) However, Plaintiff's motion and supplemental briefing do not address these claims or

provide an estimate of their value. (*See* ECF Nos. 5, 18.)[7]

The Court is concerned that the settlement class members are releasing claims without reasonable compensation. If the claims pled in the complaint have no value, Plaintiff must explain why these allegations are entirely valueless and why it is fair and reasonable for the class members to release them.

### 5. Attorneys' Fees

Plaintiff's counsel requests preliminary approval of attorneys' fees totaling $400,000.00, representing approximately one-third of the maximum settlement amount. *"When making a preliminary fairness determination of a proposed class action, the court should assess the reasonableness of the attorney's fee award because an inordinate fee may be the sign that counsel sold out the class's claims at a low value in return for the high fee." Lusk,* 2019 WL 7047891, at *8 (citation and quotation marks omitted). Where a defendant is willing to pay high fees, this "may also indicate that the relief in the settlement undervalues the class's claims[.]" *Id.* Thus, while the Court acknowledges that the determination of attorneys' fees may appropriately be deferred to the final approval stage, the amount of attorneys' fees is relevant to the determination of whether a settlement is fair, reasonable, and adequate.

Here, Plaintiff argues that district courts in the Ninth Circuit routinely award attorneys' fees of one-third or more of the common fund, particularly for wage and hour class action settlements. (ECF No. 18 at 28.) However, as Plaintiff acknowledges in his briefing, 25%, and not one-third, is the benchmark in the Ninth Circuit. *See Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1029 (9th Cir. 1998). (ECF No. 18 at 27.) While "courts may adjust this figure upwards or downwards if the record shows special circumstances justifying a departure," *Ontiveros v. Zamora,* 303 F.R.D. 356, 372 (E.D. Cal. 2014), Plaintiff's counsel has not made any showing that such a departure is warranted here. *See Vizcaino v. Microsoft Corp.,* 290 F.3d 1043, 1048 (9th Cir. 2002) (setting forth factors to be considered when adjusting the 25% benchmark). Indeed, the matter was settled prior to almost any discovery or law and motion practice. While not dispositive, Plaintiff's counsel's request for above-benchmark compensation without explanation,

---

[7] Likewise, as noted above, the PAGA claim encompasses violations of several Labor Code sections, and these claims are purportedly released by the settlement. However, Plaintiff's valuation of the PAGA claim assumes only one violation occurred and does not adequately explain why the other alleged violations have no value.

and at this early stage in the case with very little litigation, is another basis for the Court's concern that the proposed settlement was arrived at without due consideration for the interests of absent class members.

Plaintiff's motion also does not provide any information to calculate a lodestar amount.[8] While not required, without that information and in light of the issues listed above, the Court cannot conclude that the requested fees are reasonable.

### 6. Incentive Award

Finally, the proposed incentive award of $10,000.00 to Plaintiff appears excessive under the circumstances of this case. It is approximately 1.43% of the net settlement amount, and is significantly higher than the average of $1,390.00 that Plaintiff estimates each settlement class member will receive. *See Sandoval v. Tharaldson Emple. Mgmt.,* 2010 WL 2486346, at *9-10 (C.D. Cal. June 15, 2010) (collecting cases and concluding that a request for an incentive award representing one percent of the settlement fund was excessive). Notably, the activities Plaintiff performed appear to be typical for wage-and-hour putative class actions. (*See* ECF No. 18-2.) In light of the Court's finding that Plaintiff has failed to establish that the settlement is fair, adequate, and reasonable, if Plaintiff renews his request for an incentive award that amounts to a similarly high proportion of the overall settlement amount or is disproportionate relative to the recovery of other class members, Plaintiff should submit evidence establishing that the requested award is warranted.

### IV.   CONCLUSION AND RECOMMENDATION

In light of the foregoing, IT IS HEREBY RECOMMENDED that Plaintiff's motion for preliminary approval of a class action settlement (ECF No. 5) be DENIED.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l). Within fourteen

---

[8] A lodestar method is also permitted for determining attorney's fees. *See Hanlon,* 150 F.3d at 1029 (reasoning that the Ninth Circuit has affirmed the use of either the percentage or lodestar method where the settlement creates a common fund). Therefore, if Plaintiff includes a lodestar analysis in any renewed motion, either as the method for analyzing fees or as a crosscheck for the percentage analysis, Plaintiff's analysis should focus on rates awarded in the Fresno Division of this district. *See Quiroz v. City of Ceres,* 2019 WL 1005071, at *7 (E.D. Cal. Mar. 1, 2019) (setting forth hourly rates accepted as reasonable for lodestar purposes in the Fresno Division; *see also Vizcaino,* 290 F.2d at 1050 (applying the lodestar method as a cross-check to determine the reasonableness of a percentage fee request).

(14) days after being served with these findings and recommendations, the parties may file written objections with the Court. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within fourteen (14) days after service of the objections. The parties are advised that failure to file objections within the specified time may result in the waiver of the "right to challenge the magistrate's factual findings" on appeal. *Wilkerson v. Wheeler*, 772 F.3d 834, 839 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **November 15, 2021**                    /s/ _____

UNITED STATES MAGISTRATE JUDGE